AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 09/10/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___DM___ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 09/10/21 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___jm___ DEPUTY |

United States of America

v.

RICHARD GUTIERREZ and
ARIEL NOVELO TERAN,

Defendant(s)

Case No. 2:21-mj-04211

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 8, 2021, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 846, 841(a)(1) | Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Eric Selfridge
Complainant's signature

Eric Selfridge, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:                09/10/21

Judge's signature

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
Printed name and title

AUSA: Maria Elena Stiteler (x6148)

## AFFIDAVIT

I, Eric G. Selfridge, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Richard GUTIERREZ ("GUTIERREZ") and Ariel Novelo TERAN ("TERAN") for a violation of 21 U.S.C. §§ 846, 841(a)(1): Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Homeland Security Investigations in Commerce, California (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A:

   a.   SUBJECT DEVICE 1: a ZTE Cricket Smart phone with blue back, recovered during the arrest of TERAN; and

   b.   SUBJECT DEVICE 2: a white and grey Apple iPhone in a clear case with serial number F2LP18RRG5QG and IMEI 354391065969060, recovered during the arrest of TERAN.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and to possess with intent to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.   I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"), and have been so employed since September 2018.  In April 2019, I completed the Criminal Investigator Training Program and Homeland Security Investigations SA Training at the Federal Law Enforcement Training Center.  I am currently assigned as a SA with the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA IMPACT").  Prior to my employment by the Department of Homeland Security, I was employed as a Deputy Sheriff by the Sheriff of Arlington County, Virginia, for approximately two years.

6.   During the course of my employment as a law enforcement officer, I have received training regarding laws pertaining to arrest, search and seizure, and evidence collection.  I have also gained practical experience making arrests, conducting searches and seizures, and collecting

evidence.  Between my employment by the Department of Homeland Security and the Arlington County Sheriff's Office, I have received over one year of academy training, and over one year of formalized field training.

7.    Additionally, I have had hundreds of hours of formal and informal training in a wide variety of investigative and other law enforcement subjects, including mobile surveillance and narcotics sales and trafficking investigations.  I have received numerous hours of instruction from SAs and detectives at LA IMPACT regarding narcotics packaging, sales, transportation, and usage.  I have received training from court qualified experts in the fields of criminal investigations and narcotics-related investigations.

8.    During the course of my employment, I have received specialized training in the fields of criminal investigation by attending numerous courses in criminal law, criminal investigation, narcotics investigation and laws of arrest.  I have attended a one-day surveillance class, which included mobile and static surveillance.  The class also covered counter-surveillance tactics utilized by criminals.  I have conducted covert surveillance on residences and subjects that are suspected of selling narcotics.

9.    I have assisted in serving search warrants for the Department of Homeland Security, the Federal Bureau of Investigation, the California Department of Justice, several local police departments, and LA IMPACT, in connection with investigations regarding narcotics, weapons, and various other

offenses.  I have had specialized training and field experiences
in violations dealing with heroin, cocaine, amphetamines,
cannabis, depressants, prescription medication, and other
dangerous drugs.

### III. SUMMARY OF PROBABLE CAUSE

10.  On September 8, 2021, Customs and Border Protection
("CBP") officers saw a white 2005 Scion bearing California
license plate number 5LBB341 (the "White Scion") enter the
United States from Mexico at the San Ysidro, California Port of
Entry.  The White Scion was randomly referred to secondary
inspection, where a CBP canine handler conducted an exterior and
interior sniff of the White Scion and received positive alerts.
A CBP officer scanned the White Scion with an x-ray machine that
revealed anomalies consistent with concealed narcotics.

11.  CBP officers and Homeland Security Investigations
agents elected to release GUTIERREZ and the White Scion without
further delay so the White Scion could be followed to its
intended destination without alerting GUTIERREZ or other co-
conspirators to the involvement of law enforcement.  HSI agents
and other law enforcement agencies in the San Diego and Los
Angeles area conducted surveillance on the White Scion, and
ultimately watched the vehicle pull into the driveway of the
premises located at 12060 Pierce Street, Sylmar, California (the
"Pierce Street Premises"), where Los Angeles Police Department
aerial surveillance saw people at the Pierce Street Premises,
including a man wearing a red hat later identified as TERAN,
take the interior door panels off of the White Scion, remove

bags from the White Scion, and carry the bags into a shed on the Pierce Street Premises.

12.  Law enforcement observed TERAN drive the White Scion from the Pierce Street Premises to a nearby shopping center, where GUTIERREZ took possession of the White Scion.  TERAN then entered a silver Ford F-150 bearing temporary California license plate number BS66B28 (the "Silver Ford").

13.  On September 8, 2021, the Honorable Gail J. Standish issued search warrants to search the Pierce Street Premises, the White Scion, the Silver Ford, and GUTIERREZ for violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) in case numbers 2:21-mj-04194, 2:21-mj-04195, 2:21-mj-04196, and 2:21-mj-04200.

14.  Law enforcement executed the federal search warrants on September 8, 2021, and recovered approximately 74 pounds of a white crystalline substance that field tested positive as methamphetamine from the Pierce Street Premises and recovered bulk US currency from the Silver Ford.

15.  The SUBJECT DEVICES were recovered from TERAN during the traffic stop of the Silver Ford.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.  **HSI INVESTIGATORS IDENTIFY THE WHITE SCION CONTAINING SUSPECTED NARCOTICS AT THE SAN YSIDRO PORT OF ENTRY**

17.  I reviewed the report of CBP Officer A. Aldape, which stated the following, in substance and in part:

a.  On September 8, 2021, at approximately 9:46 a.m., CBP Officer Aldape observed GUTIERREZ, driving the White Scion, approach CBP Officer Aldape's booth at the San Ysidro, California Port of Entry.  CBP Officer Aldape conducted a name check on GUTIERREZ and received a computer-generated alert, which I understand from my training and experience means the vehicle was randomly referred for secondary screening.  CBP Officer Aldape reported checking GUTIERREZ's six-month border crossing history, and saw that GUTIERREZ had no border crossings prior to August 2021, but has had multiple border crossings since that date.  GUTIERREZ told CBP Officer Aldape that he was travelling to Otay Mesa for work.  CBP Officer Aldape referred GUTIERREZ and the White Scion for secondary screening.

18.  I reviewed the report of CBP Canine Officer Mattoon, which stated the following, in substance and in part:

a.  CBP Canine Officer Mattoon screened the White Scion with the officer's certified drug detection dog and received positive alerts.  Specifically, the drug detection dog alerted to an odor at the rear of the White Scion.  CBP Canine Officer Mattoon opened the White Scion's rear hatch, and the drug detection dog alerted to the inside quarter panel trim on the driver's side.

19.   I reviewed the report of CBP Officer Walker, which stated the following, in substance and in part:

a.   During the secondary screening, CBP Officer Walker also scanned the White Scion with a Z-Portal x-ray machine.  CBP Officer Walker observed anomalies within the right and left rear quarter panels of the White Scion consistent with concealed narcotics, as seen in the below images:



Left Side Backscatter



Right Side Backscatter

20.   To facilitate further investigation, CBP officers did not open the White Scion or search for the suspected narcotics. Instead, agents decided to try to follow the White Scion to its

intended destination using pursuit, aerial surveillance, and a GPS tracking device.[1]

21.   After the White Scion left the Port of Entry, agents followed it as it traveled north along Interstate 5 towards Los Angeles, California.

**B.   AGENTS VISUALLY SURVEIL THE WHITE SCION IN THE LOS ANGELES AREA**

22.   On September 8, 2021, HSI agents assigned to LA IMPACT, detectives from the Hawthorne Police Department ("HPD"), and aerial surveillance from Los Angeles Police Department Special Flights Services ("LAPD SFS"), took over lead surveillance of SUBJECT VEHICLE 1 from agents assigned to HSI San Diego Narcotics Enforcement Team ("SDNET") along Interstate 5 in Orange County.

23.   From speaking to LA IMPACT agents who participated in the surveillance and enforcement operation, I understand the following:

a.   At approximately 2:20 p.m., GUTIERREZ drove the White Scion to a location nearby the Pierce Street Premises, where he transferred possession of the vehicle to an unknown person.  GUTIERREZ left the area unobserved on foot.  At

---

[1] Agents covertly installed a GPS tracking device on the White Scion while at the border.  Because of the exigencies of the situation and to avoid a longer delay that could have caused the driver or any co-conspirators to suspect or detect that the suspected narcotics had been discovered by law enforcement, agents installed the GPS tracking device and allowed the White Scion to leave before applying for a warrant.  Agents did not immediately monitor the GPS tracking device.  Rather, after installation, an HSI agent applied for and received authorization from the Honorable Allison H. Goddard in the Southern District of California to use the pre-installed GPS tracking device on the White Scion.

approximately 2:26 p.m., the unknown driver drove the White
Scion to the driveway of the Pierce Street Premises.

       b.   Beginning at approximately 2:30 p.m., LAPD SFS
officers saw multiple unknown persons at the Pierce Street
Premises, including a man wearing a red hat (later identified as
TERAN), remove the interior door panels from the White Scion,
remove bags from the White Scion, and carry the bags into a shed
on the Pierce Street Premises.

       c.   At approximately 2:56 p.m., law enforcement
observed TERAN drive the White Scion from the Pierce Street
Premises to a nearby shopping center, where GUTIERREZ took
possession of the White Scion.  TERAN then entered the Silver
Ford, which was driven by a third person with initials R.T.V.

       d.   Law enforcement conducted traffic stops of both
the White Scion and the Silver Ford at separate locations.

   **C.**   **SEARCH OF THE PIERCE STREET PREMISES, THE WHITE SCION,
AND THE SILVER FORD**

   24.   On September 8, 2021, the Honorable Gail J. Standish
issued search warrants to search the Pierce Street Premises, the
White Scion, the Silver Ford, and GUTIERREZ for violations of 21
U.S.C. § 841(a)(1) (possession with intent to distribute
controlled substances) and 21 U.S.C. § 846 (conspiracy and
attempt to distribute controlled substances) in case numbers
2:21-mj-04194, 2:21-mj-04195, 2:21-mj-04196, and 2:21-mj-04200.
The affidavit in support of the search warrant is attached
hereto as Exhibit 1 and incorporated herein by reference.

25.  Law enforcement officials executed the warrant to search the Pierce Street Premises, the White Scion, and the Silver Ford, on September 8, 2021.  As I understand from speaking to participating HSI agents:

a.  Approximately 73.6 pounds of a white crystalline substance that field-tested positive as methamphetamine were recovered from a shed in the rear of the property.  These narcotics were packaged in a total of 69 approximately one-pound packages, which were concealed within two livestock feed bags, which were then concealed inside a blue plastic barrel. Additionally, approximately 11.8 ounces of suspected methamphetamine were found in a wooden box in the same shed. This suspected methamphetamine was packaged in smaller plastic bags consistent with narcotics distribution.  The property owner of the Pierce Street Premises advised that the buildings to the rear of the property, including the shed in which the narcotics were found, are rented out to unknown individuals.

b.  A police narcotics detection canine was used to search both the White Scion and the Silver Ford.  The canine alerted to the presence of narcotics in both vehicles.  No narcotics were recovered from either vehicle.  The canine alerted to the center console of the Silver Ford, where agents subsequently found bulk U.S. currency.  The driver, identified herein as R.T.V., stated in an interview that the bulk U.S. currency totaled approximately $26,500.

c.   One cell phone was recovered from GUTIERREZ.  The SUBJECT DEVICES were recovered from TERAN during a search incident to TERAN's arrest.

## V. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at

12

their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

27.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

14

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c.  Both digital devices recovered appear to be programmed for use in the Spanish Language, meaning that their review will require investigators that are fluent in the Spanish Language, as well as translators fluent in the Spanish Language, which will significantly increase the amount of time necessary to review the devices.

30.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

15

which I know from my training, experience, and review of
publicly available materials:

   a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

   b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
all of the passcodes of the devices likely to be found in the
search.

   c.   The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of

the warrant: (1) depress TERAN's thumb- and/or fingers on the devices; and (2) hold the devices in front of TERAN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

32.  For all of the reasons described above, there is probable cause to believe that GUTIERREZ and TERAN have violated 21 U.S.C. §§ 846, 841(a)(1): Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>10th</u> day of September, 2021.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

17

**EXHIBIT 1**

**AFFIDAVIT**

I, Eric G. Selfridge, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search:

a.    The premises located at 12060 Pierce Street, Sylmar, California, as described further in Attachment A-1 ("SUBJECT PREMISES");

b.    A white 2005 Scion bearing California license plate number 5LBB341, as described further in Attachment A-2 ("SUBJECT VEHICLE 1");

c.    A silver Ford F-150 bearing temporary California license plate number BS66B28, as described further in Attachment A-3 ("SUBJECT VEHICLE 2");

d.    The person of Richard GUTIERREZ ("GUTIERREZ"), as described further in Attachment A-4.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and to possess with intent to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am a Special Agent ("SA") with Homeland Security
Investigations ("HSI"), and have been so employed since
September 2018.  In April 2019, I completed the Criminal
Investigator Training Program and Homeland Security
Investigations SA Training at the Federal Law Enforcement
Training Center.  I am currently assigned as a SA with the Los
Angeles Interagency Metropolitan Police Apprehension Crime Task
Force ("LA IMPACT").  Prior to my employment by the Department
of Homeland Security, I was employed as a Deputy Sheriff by the
Sheriff of Arlington County, Virginia, for approximately two
years.

5.   During the course of my employment as a law
enforcement officer, I have received training regarding laws
pertaining to arrest, search and seizure, and evidence
collection.  I have also gained practical experience making
arrests, conducting searches and seizures, and collecting
evidence.  Between my employment by the Department of Homeland
Security and the Arlington County Sheriff's Office, I have

received over one year of academy training, and over one year of formalized field training.

6.    Additionally, I have had hundreds of hours of formal and informal training in a wide variety of investigative and other law enforcement subjects, including mobile surveillance and narcotics sales and trafficking investigations.  I have received numerous hours of instruction from SAs and detectives at LA IMPACT regarding narcotics packaging, sales, transportation, and usage.  I have received training from court qualified experts in the fields of criminal investigations and narcotics-related investigations.

7.    During the course of my employment, I have received specialized training in the fields of criminal investigation by attending numerous courses in criminal law, criminal investigation, narcotics investigation and laws of arrest.  I have attended a one-day surveillance class, which included mobile and static surveillance.  The class also covered counter-surveillance tactics utilized by criminals.  I have conducted covert surveillance on residences and subjects that are suspected of selling narcotics.

8.    I have assisted in serving search warrants for the Department of Homeland Security, the Federal Bureau of Investigation, the California Department of Justice, several local police departments, and LA IMPACT, in connection with investigations regarding narcotics, weapons, and various other offenses.  I have had specialized training and field experiences in violations dealing with heroin, cocaine, amphetamines,

cannabis, depressants, prescription medication, and other
dangerous drugs.

### III. SUMMARY OF PROBABLE CAUSE

9.    On September 8, 2021, Customs and Border Protection
("CBP") officers saw the SUBJECT VEHICLE 1 enter the United
States from Mexico at the San Ysidro, California Port of Entry.
The SUBJECT VEHICLE 1 was randomly referred to secondary
inspection, where a CBP canine handler conducted an exterior and
interior sniff of the SUBJECT VEHICLE 1 and received positive
alerts.  A CBP officer scanned the SUBJECT VEHICLE 1 with an x-
ray machine that revealed anomalies consistent with concealed
narcotics.

10.   CBP officers and Homeland Security Investigations
agents elected to release GUTIERREZ and the SUBJECT VEHICLE 1
without further delay so the SUBJECT VEHICLE 1 could be followed
to its intended destination without alerting GUTIERREZ or other
co-conspirators to the involvement of law enforcement.  HSI
agents and other law enforcement agencies in the San Diego and
Los Angeles area conducted surveillance on the SUBJECT VEHICLE
1, and ultimately watched the vehicle pull into the driveway of
the SUBJECT PREMISES, where Los Angeles Police Department aerial
surveillance saw people at the SUBJECT PREMISES, including a man
wearing a red hat later identified as Ariel Novelo TERAN
("TERAN"), take the interior door panels off of the SUBJECT
VEHICLE 1, remove bags from the SUBJECT VEHICLE 1, and carry the
bags into a shed on the SUBJECT PREMISES.

11. Law enforcement observed then TERAN drive SUBJECT VEHICLE 1 from the SUBJECT PREMISES to a nearby shopping center, where GUTIERREZ took possession of SUBEJCT VEHICLE 1. TERAN then entered SUBJECT VEHICLE 2.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. HSI INVESTIGATORS IDENTIFY THE SUBJECT VEHICLE 1 CONTAINING SUSPECTED NARCOTICS AT THE SAN YSIDRO PORT OF ENTRY**

13. I reviewed the report of CBP Officer A. Aldape, which stated the following, in substance and in part:

a. On September 8, 2021, at approximately 9:46 a.m., CBP Officer Aldape observed GUTERRIEZ, driving SUBJECT VEHICLE 1, approach CBP Officer Aldape's booth at the San Ysidro, California Port of Entry. CBP Officer Aldape conducted a name check on GUTIERREZ and received a computer-generated alert, which I understand from my training and experience means the vehicle was randomly referred for secondary screening. CBP Officer Aldape reported checking GUTIERREZ's six-month border crossing history, and saw that GUTIERREZ had no border crossings prior to August 2021, but has had multiple border crossings since that date. GUTIERREZ told CBP Officer Aldape that he was travelling to Otay Mesa for work. CBP Officer Aldape referred GUTIERREZ and SUBJECT VEHICLE 1 for secondary screening.

14. I reviewed the report of CBP Canine Officer Mattoon, which stated the following, in substance and in part:

5

        a.    CBP Canine Officer Mattoon screened SUBJECT
VEHICLE 1 with the officer's certified drug detection dog and
received positive alerts.  Specifically, the drug detection dog
alerted to an odor at the rear of SUBJECT VEHICLE 1.  CBP Canine
Officer Mattoon opened SUBJECT VEHICLE 1's rear hatch, and the
drug detection dog alerted to the inside quarter panel trim on
the driver's side.

    15.  I reviewed the report of CBP Officer Walker, which
stated the following, in substance and in part:

        a.    During the secondary screening, CBP Officer
Walker also scanned the SUBJECT VEHICLE 1 with a Z-Portal x-ray
machine.  CBP Officer Walker observed anomalies within the right
and left rear quarter panels of the SUBJECT VEHICLE 1 consistent
with concealed narcotics, as seen in the below images:



**Left Side Backscatter**



**Right Side Backscatter**

16.  To facilitate further investigation, CBP officers did not open the SUBJECT VEHICLE 1 or search for the suspected narcotics.  Instead, agents decided to try to follow SUBJECT VEHICLE 1 to its intended destination using pursuit, aerial surveillance, and a GPS tracking device.[1]

17.  After SUBJECT VEHICLE 1 left the Port of Entry, agents followed it as it traveled north along Interstate 5 towards Los Angeles, California.

**B.   AGENTS VISUALLY SURVEIL THE SUBJECT VEHICLE 1 IN THE LOS ANGELES AREA**

18.  On September 8, 2021, HSI agents assigned to LA IMPACT, detectives from the Hawthorne Police Department ("HPD"),

_____

[1] Agents covertly installed a GPS tracking device on SUBJECT VEHICLE 1 while at the border.  Because of the exigencies of the situation and to avoid a longer delay that could have caused the driver or any co-conspirators to suspect or detect that the suspected narcotics had been discovered by law enforcement, agents installed the GPS tracking device and allowed SUBJECT VEHICLE 1 to leave before applying for a warrant.  Agents did not immediately monitor the GPS tracking device.  Rather, after installation, an HSI agent applied for and received authorization from the Honorable Allison H. Goddard in the Southern District of California to use the pre-installed GPS tracking device on SUBJECT VEHICLE 1.

and aerial surveillance from Los Angeles Police Department
Special Flights Services ("LAPD SFS"), took over lead
surveillance of SUBJECT VEHICLE 1 from agents assigned to HSI
San Diego Narcotics Enforcement Team ("SDNET") along Interstate
5 in Orange County.

19.   From speaking to LA IMPACT agents who participated in
the surveillance and enforcement operation, I understand the
following:

a.   At approximately 2:20 p.m., GUTIERREZ drove
SUBJECT VEHICLE 1 to a location nearby the SUBJECT PREMISES,
where he transferred possession of the vehicle to an unknown
person.  GUTIERREZ left the area unobserved on foot.  At
approximately 2:26 p.m., the unknown driver drove SUBJECT
VEHICLE 1 to the driveway of the SUBJECT PREMISES.

b.   Beginning at approximately 2:30 p.m., LAPD SFS
officers saw multiple unknown persons at the SUBJECT PREMISES,
including a man wearing a red hat (later identified as TERAN),
remove the interior door panels from the SUBJECT VEHICLE 1,
remove bags from the SUBJECT VEHICLE 1, and carry the bags into
a shed on the SUBJECT PREMISES.

c.   At approximately 2:56 p.m., law enforcement
observed TERAN drive SUBJECT VEHICLE 1 from the SUBJECT PREMISES
to a nearby shopping center, where GUTIERREZ took possession of
SUBJECT VEHICLE 1.  TERAN then entered SUBJECT VEHICLE 2, which
was driven by a third person with initials R.T.V.

d.   Law enforcement conducted traffic stops of both
SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 at separate locations.

## V. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

20.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences, stash houses, and vehicles.

c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

        e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

        f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

        g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug

trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

21.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

--------

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally

13

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GUTIERREZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of GUTIERREZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

25.  For the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at or in SUBJECT PREMISES, the SUBJECT VEHICLE 1, SUBJECT VEHICLE 2, and the person of GUTIERREZ, as described in Attachments A-1, A-2, A-3, and A-4, respectively.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __8__ day of
September, 2021.

_____
HONORABLE GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

15